UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TERRANCE KEMP, a/k/a Terrance J. Kemp;
THEODORE R. SMITH; DENNIS G. MCKAY;
STEPHON D. BURKETT; and MATTHEW
THOMPSON,

                              Plaintiffs,

        -v-                                          1:11-CV-706

CSX TRANSPORTATION, INC.,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

SMITH HOKE, PLLC                    JOHN J. HOKE, ESQ.
Attorneys for Plaintiffs           MEREDITH A. MORIARTY, ESQ.
7 Southwoods Boulevard
Suite 103
Albany, NY  12211

NIXON PEABODY LLP                  SUSAN C. RONEY, ESQ.
Attorneys for Defendant            LYNNETTE NOGUERAS-TRUMMER, ESQ.
40 Fountain Plaza
Suite 500
Buffalo, NY  14202

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Plaintiffs Terrance Kemp, Theodore Smith, Dennis McKay, Stephon Burkett, and

Matthew Thompson (collectively "plaintiffs") work, or have worked, for defendant CSX

Transportation, Inc. ("CSX") as train conductors in the company's Albany Division, which is

based in Selkirk, New York. They initiated this action on June 23, 2011, and filed an amended complaint on December 14, 2011.[1] Plaintiffs allege racial discrimination by CSX, and they each bring the following three claims pursuant to the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. § 1981: (1) disparate treatment by being terminated and/or subjected to harsher discipline than non-minority colleagues ("First Cause of Action"); (2) disparate treatment by being denied an equal opportunity to work on the more lucrative Buffalo rail line[2] ("Second Cause of Action"); and (3) a hostile work environment ("Third Cause of Action"). They also assert three pendent New York Human Rights Law ("NYHRL") claims that mirror the three federal claims ("Fourth, Fifth, and Sixth Causes of Action").

The parties have completed discovery, and CSX has filed six separate motions—a motion for summary judgment with regard to each of the five plaintiffs and a motion to preclude the testimony of plaintiffs' expert, Jamie C. Modesitt. The motions have been fully briefed, and oral argument was heard on September 5, 2013, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed. CSX is a large corporation that operates railroads across the United States and has its headquarters in Florida. It maintains policies on equal employment opportunity, harassment, and ethics. CSX employees receive training on these policies, which are posted on the company's internal website and in its regional railroad yard offices. CSX also has an "Ethics Hotline"

---

[1] Terrance Kemp was the only named plaintiff in the original complaint. The other four plaintiffs did not join the litigation until the amended complaint was filed.

[2] The Buffalo Line runs from Selkirk to Buffalo. This is the most sought-after route in the Albany Division because conductors are paid by the distance of a route, and the Buffalo Line is the longest route.

through which employees may report violations of company policies, triggering an internal investigation. In addition, the company maintains various policies regarding employee discipline and absenteeism.

Disciplinary infractions are handled pursuant to CSX's Individual Development and Personal Accountability Policy ("IDPAP"). Under this policy, which applies to conductors as well as engineers, an employee's infraction is categorized as a minor, serious, or major offense. The potential disciplinary measures increase with the severity of the offense. Depending on the infraction, the disciplinary process may include a hearing at the local level. The charged employee is permitted to have a union representative present at such a hearing, which is conducted by a hearing officer and recorded. The employee may appeal the determination of the hearing officer to the Public Law Board.[3] If an employee is terminated, the union may seek a "leniency reinstatement" of that employee after a certain period of time and depending on the offense that led to dismissal. The disciplinary process takes into account the number of prior violations for an offending employee. Infractions are removed from an employee's record after three years.

Patrick Murphy is the Manager of Field Administration for CSX and is based in Florida. The parties agree that Murphy is tasked with maintaining consistency in the handling of employee disciplinary measures under IDPAP, but they dispute his involvement in the actual imposition of discipline. CSX asserts that Murphy is involved "from the initial charge to the discipline letter that is sent to the employee." Def.'s Statement of Material Facts, ECF No. 44-38, ¶ 16. Plaintiffs allege that Murphy merely codes the employee's conduct as minor,

---

[3] The Public Law Board is an independent tribunal established for the arbitration of labor disputes in the railroad industry.

serious, or major, while the actual discipline is left to the discretion of divisional managers.

Infractions related to absenteeism are guided by the company's Absenteeism Policy, which also provides for progressive discipline. The first two violations result in counseling letters. This is followed by three "Steps" of formal discipline. Possible discipline for a Step 3 violation includes termination. Anita Tingley, based in Florida, is the Manager of Manpower and Crew Availability Specialist for CSX. She is tasked with handling disciplinary issues related to employee absenteeism. When an employee has violated the Absenteeism Policy, she verifies what step in the disciplinary process that employee is at and creates an incident form. Similar to the IDPAP scheme, violations of the Absenteeism Policy are removed from an employee's record after three years.

Plaintiffs Kemp, Smith, Burkett, and Thompson are African–Americans; plaintiff McKay is a Jamaican–American. All five plaintiffs reside in the Albany, New York, area and are either currently employed or have been employed by CSX as train conductors based in Selkirk, New York. Their employment is subject to the aforementioned company policies and the provisions of a collective bargaining agreement between CSX and the United Transportation Union, of which plaintiffs were members at the relevant time.

Generally, plaintiffs claim CSX employees repeatedly hurled racial slurs at them or in their presence, painted the words "nigger," "porch monkey," and "spook" on bathroom walls and other surfaces at the Selkirk facility, and displayed images of the Confederate flag at various facilities in the region. They allege that CSX supervisors were often present when racial slurs were used. Defendant maintains that any graffiti was removed, and employees were counseled on the unacceptable use of racial slurs. Plaintiffs acknowledge that the graffiti was periodically painted over, but claim it regularly reappeared. In addition to these

- 4 -

common allegations of a hostile work environment, plaintiffs have unique employment histories and each allege different incidents of disparate treatment.

## A. Plaintiff Terrance Kemp

On October 31, 1996, Kemp began working as a laborer for Conrail, which was acquired by CSX in June 1999. He became a conductor in 2001 and worked on the River Line, which runs from Selkirk to New Jersey. Kemp initially asked to qualify to work on the Buffalo Line in 2003, but William Edwards, the Crew Management Director, allegedly delayed his qualification while allowing less-senior non-minority conductors to qualify.[4] Kemp claims that he was permitted to start the qualification process only after he complained of unequal treatment. He eventually became qualified to work on the Buffalo Line, passed the written exam in August 2006, and began working on that line in September or October of 2006. He alleges that Division Foreman Mark Novenche accused him and co-plaintiff Theodore Smith of cheating on the exam and required them to retake the test. They maintain that no other conductor has ever been required to retake the exam.

Kemp received four "operational test failure notations" under IDPAP for infractions in 2005. The first incident occurred on February 21, 2005, and involved the derailment of a train operated by Kemp and a Caucasian engineer, Cory Engle. Supervisor Mark McGee issued Kemp a citation for the derailment. Kemp claims that although Engle admitted the derailment was completely his fault, he was not cited for the incident. No disciplinary action was taken against Kemp, but the citation remained on his employment record.

---

[4] To qualify to work on another line, a conductor must receive approval to ride on the desired line to become familiar with it. While learning the new route, that conductor is not available to work on his old route. The Buffalo Line is the most lucrative route because it is the longest, and a conductor's compensation is based on the length of the route.

The second incident took place on May 8, 2005, when Trainmaster Deyo[5] cited Kemp for a communication lapse during a maneuver. No disciplinary action was taken, but Kemp claims he was singled out for the citation while the white engineer with whom he was working was not cited. Kemp was cited for the third time on July 26, 2005, after Trainmaster Chris Cameron reportedly witnessed him improperly dismount a train. Kemp was required to attend a safety counseling session, but no formal disciplinary action was taken.

The fourth incident occurred in September 2005 when Road Foreman Joseph DiStefano cited Kemp and a white engineer for failure to sound a horn at a railroad crossing. Kemp claims that when the engineer attempted to take full responsibility for the infraction, DiStefano told the engineer that Kemp should "be swinging from a tree." Am. Compl. ¶ 24. Kemp acknowledges that he did not personally hear the remark.

Kemp alleges that, in December 2005, engineer Paul Splain repeatedly used the word "nigger" while working with Kemp and discussing the death of comedian Richard Pryor. Kemp alleges that while working with John Lacona, Sr., in October 2006, Lacona began talking loudly on the phone in Kemp's presence. Lacona reportedly yelled "I'm glad the nigger chief is gone," referring to Trainmaster Marcus McCant, an African–American. Am. Compl. ¶ 38. Kemp further alleges that multiple CSX employees often called Trainmaster McCant a "coconut" or "coconut head," which Kemp argues are racial slurs. Id. ¶ 56.

During his employment with CSX, Kemp was accused of violating the Absenteeism Policy numerous times. He received counseling letters for violations on May 15, 2005, and October 27, 2005. On October 23, 2006, he was charged with a Step 1 violation for a

---

[5] The parties do not identify Mr. Deyo's first name.

missed call.  He signed a letter accepting responsibility for that violation and waived his right to a formal investigation.  On June 29, 2007, he was charged with a Step 2 violation for missing a call on June 21.  An investigative hearing was held, and he was suspended for five days.  In May 2008 he was charged with a Step 3 violation for failure to be available to work a sufficient amount of days during the time period ending on May 4, 2008.[6]  At the ensuing hearing, which was presided over by Hearing Officer Seth Fowler, Kemp admitted that he used bereavement leave inappropriately,[7] and his employment was terminated.

In a post-hearing email to Fowler, Assistant Terminal Superintendent Gene Payne, Jr., wrote:  "Great job on this one."  Hoke Decl., Ex. W, ECF No. 61-23.  Payne then emailed Assistant Division Manager Jerald Lewandowski and, referring to Kemp, noted that "He didn't belong."  Id.  Kemp's request for a leniency reinstatement was denied.  Thereafter, he appealed the finding of Hearing Officer Fowler as well as the discipline imposed.  The Public Law Board affirmed the absenteeism violation but reinstated his employment—without back pay—as of September 2011.

Kemp claims that since his return to work, the Albany Division Manager, John Gaylord, has refused to speak with him about his reintegration into the Selkirk facility.  He further alleges that, although permitted to participate in computer testing and training, he has not been granted access to the rail yard in order to re-qualify to work as a conductor.  Finally, he claims that the use of racial slurs continues at CSX.  During a training session on November 3, 2011, Kemp heard co-worker Kent Clark call Trainmaster McCant a "coconut."  Kemp

---

[6]  The pertinent policy requires an employee to be available to work forty-four days in an eight week period.  Kemp was charged with being available only forty days.

[7]  Kemp took time off to attend court proceedings in his matrimonial action, not to grieve a death in the family.

reported this to the Ethics Hotline, which was his first such complaint to the Hotline.

### B. Plaintiff Theodore R. Smith

Smith began working as a conductor on the River Line in September 2004.  He claims that in 2005 another River Line conductor, Richard Carroll, remarked:  "Why do they let monkeys on the railroad?"  Def.'s Statement of Material Facts, ECF No. 45-53, ¶ 63.  Smith maintains this comment was directed at him because he had incorrectly filled out a form.  An unknown Caucasian employee was present when Carroll uttered this statement.

In April 2006 Smith contacted William Edwards, the Crew Management Director, and requested to qualify for the Buffalo Line.  In August 2006 he became qualified to work on that line and passed the written exam.  As noted above, he alleges that Division Foreman Mark Novenche accused him and Kemp of cheating on the exam and required them to retake the test.

Between January and October 2007, Smith was granted intermittent leave under the Family Medical Leave Act ("FMLA") in order to recover from a back injury.  Three subsequent requests for additional FMLA leave were denied because, according to CSX, he did not meet the eligibility requirements of the FMLA.  On August 6, 2008, he was advised that any absences would be counted as violations of the Absenteeism Policy unless he obtained a new FMLA approval.  Smith then contacted his union representative and requested a light duty assignment while he convalesced.  Smith claims CSX management denied this request.  Defendant maintains that Smith did not make this request through the proper channels.  At least one Caucasian employee was granted light duty and excess FMLA leave while temporarily disabled.

During his employment with CSX, Smith was accused of violating the Absenteeism

Policy several times.  He received counseling letters for attendance issues and/or missed calls on January 29, 2006; November 3, 2006; and November 26, 2006.  On January 18, 2007, he received a letter charging him with a Step 2 violation for missing a call on January 12.  He accepted responsibility for that infraction and was suspended for two days.  In September 2007 and April 2008 Smith acknowledged separate failures to meet minimum availability requirements and was suspended for three days and one month, respectively.  He thus progressed to Step 3 of the Absenteeism Policy.  He claims that these absences were due to his back injury and defendant's refusal to grant his requests for FMLA medical leave.

Smith resigned on September 9, 2008, two days before a scheduled hearing into two additional alleged attendance violations.  He claims that he resigned due to the continued racist remarks directed at him and because his union representative advised that the management intended to fire him.  He did not report any instances of discrimination to the Ethics Hotline, but instead reported all incidents to his union representative.

### C. **Plaintiff Dennis G. McKay**

McKay began his employment with Conrail in 1993.  He took the test to qualify as a conductor on the Buffalo Line in April 1999, before CSX acquired Conrail in June 1999.  He claims less-senior, non-minority conductors were permitted to qualify for that line immediately after being hired.  He also alleges that while working on the Buffalo Line, engineer Steve Bennie regularly called him a "nigger" and "black bastard."  He also worked with engineer Tim Addison, who he alleges often told him to "get back on a banana boat and go back to Jamaica."  Def.'s Statement of Material Facts, ECF No. 46-41, ¶ 60.  McKay did not report any of the incidents involving Addison.

On April 15, 2005, McKay was reprimanded, pursuant to IDPAP, for failure to properly

control the train he was operating, excessive speed, failure to secure the dispatcher's authorization, not protecting a reverse move, and failing to provide information to investigators. Defendant claims McKay's employment was terminated on that date and that he was granted a leniency reinstatement on April 25, 2005. McKay denies receiving any notice of termination or reinstatement, and maintains that he was only suspended for seven or fifteen days.

McKay was issued counseling letters for violations of the Absenteeism Policy on June 10, 2007, and September 14, 2007. He received notice of a Step 1 violation for missing a call on July 26, 2008. He accepted responsibility for this infraction and was suspended for two days. He was charged with a Step 2 violation for another missed call on August 31, 2008. He again accepted responsibility and was suspended for five days. He was again charged with missing a call on August 26, 2009, was suspended for fifteen days, and was elevated to Step 3 of the Absenteeism Policy.

Finally, McKay was assessed for a missed call on April 18, 2010, and, after a hearing presided over by Seth Fowler, his employment was terminated on June 3, 2010. This missed call charge arose from the fact that McKay had locked his keys and work equipment in his car. He informed his supervisor that he could find alternative transportation to work and requested permission to borrow tools for his shift. The supervisor denied that request and instead wrote him up for an absenteeism violation. McKay appealed his termination and was subsequently reinstated, without back pay, by the Public Law Board. He reports that upon his return to work, Steve Bennie continued to direct racial slurs at him, as he had done in the past. McKay reported this to Foreman Novenche, but claims no action was taken. Instead, Foreman Novenche allegedly disciplined McKay for improperly dismounting a train on

December 8, 2011.

On February 27, 2012, McKay called the Ethics Hotline and lodged a complaint against engineer Bennie. He alleged that while he and Bennie rode together in a taxi, Bennie reached over and pulled the seat belt against McKay's neck. An internal investigation was conducted; the parties dispute its sufficiency and findings. Foreman Novenche had a counseling session with Bennie. McKay's employment was again terminated on May 24, 2012, for rule violations that occurred on March 26 and April 2. He claims these were bogus infractions lodged against him in retaliation for his report against Bennie.

### D. <u>Plaintiff Stephon D. Burkett</u>

Burkett began his employment as a conductor with CSX on September 11, 2005. During his initial training in Georgia in 2005, he had a physical altercation with another trainee, Nick Madore. Burkett claims Madore called him a "nigger" during the incident, but concedes that no managers were present to hear the slur. He further alleges that co-worker Johnny Mages used the term "porch monkey" in his presence on at least one occasion.

On August 1, 2008, Burkett and Ron Weremeichik, a white engineer, were working together on the River Line. As Burkett read a magazine on the moving train, Weremeichik threw a portable radio at his head. Although Weremeichik did not use any racial slurs during this incident, he had used such vulgarity in the past while in Burkett's presence. Burkett learned that an investigation into the incident focused not on Weremeichik's conduct, but on Burkett's alleged tardiness for the shift and that he was reading a magazine while working. He accepted responsibility for these infractions and was suspended for five days under IDPAP. Weremeichik was also suspended for five days but, according to Burkett, did not actually serve his suspension.

Burkett's employment was terminated on March 31, 2009, because he had been absent from work since January 15, 2009. He did not contact his supervisors or obtain an authorized leave of absence during this time period. The collective bargaining agreement provides for the immediate termination, without a hearing, of an employee who is absent for over thirty days. Burkett claims he was absent because there was no available job position for his seniority level during that time period. On June 26, 2009, CSX offered to reinstate his employment with full seniority but without back pay. Burkett rejected the offer because, according to him, the offer included a waiver of any racial discrimination claims against CSX. He reports that white conductors were granted unqualified leniency reinstatements under similar circumstances.

Burkett did not report any incidents to the Ethics Hotline during his employment.

### E. Plaintiff Matthew Thompson

Thompson began working as a conductor for CSX on April 18, 2004. He alleges that in 2005 or 2006 engineer George Warrenfeld voiced his opinion that a black man should not be working as a conductor or making the same amount of money as white conductors. He claims that in 2008 engineers listened to the Howard Stern radio show in his presence and ignored his request to change the station due to the offensive racial slurs being used. He further alleges that at various points during his employment he overheard CSX employees make derogatory comments about how African–Americans dress and referred to them as "gangsters." He also reports that, in his presence, co-workers referred to Trainmaster McCant as a "nigger" and "coconut head" and stated, "the monkey was in the woods today." Def.'s Statement of Material Facts, ECF No. 48-34, ¶ 54.

On March 11, 2010, a train operated by Thompson and an engineer failed to stop at a

railroad crossing, which constitutes a major violation under IDPAP.  Thompson maintains that the engineer was actually controlling the locomotive at the time.  He and the engineer were tested for drugs and alcohol, and Thompson tested positive for marijuana.  A subsequent hearing was conducted by Seth Fowler, and Thompson's employment was terminated on April 1, 2010.  He appealed, but the Public Law Board affirmed his dismissal.  The involved engineer was also terminated, but was later granted a leniency reinstatement.  Thompson acknowledges his termination was justified, but alleges that the refusal to offer him reinstatement was based on racial animus.  He reports that an engineer who had been terminated in 2007 following a similar incident and subsequent positive drug test was nonetheless granted a leniency reinstatement.

Thompson did not report any incidents to the Ethics Hotline during his employment.

### F.  Plaintiffs' Experts

Plaintiffs have retained and identified two experts:  Rebecca Swann–Jackson and Jamie C. Modesitt.  Both experts have produced reports regarding the application of CSX's disciplinary policies to plaintiffs and other CSX employees.

Swann–Jackson reviewed 449 disciplinary records that were provided by CSX during discovery.  These records pertained to plaintiffs as well as other CSX employees who are not parties to this action.  She concluded that "there was a relationship between minority status and the severity of discipline imposed for disciplinary infractions pursuant to [IDPAP] and [the Absenteeism Policy]."  Roney Decl., Ex. O, ECF No. 44-16, 2.[8]  However, she also noted that there were no "statistically significant differences" in the discipline assessed for attendance

---

[8]  The pagination corresponds to the page numbers as assigned on CM/ECF.  This convention will be used throughout the order for citations to specific pages of documents.

infractions, minor, serious, or major offenses, or all offenses combined. She cautioned that her results could have been skewed by the relatively small sample size.

Modesitt, who is also an official with the United Transportation Union, reviewed the IDPAP and the Absenteeism Policy as well as plaintiffs' employment histories and those of ten similarly situated co-workers (five conductors and five engineers). He concluded that plaintiffs "were more severely punished for the same or similar infractions than similarly situated Conductors and Engineers." Roney Decl., Ex. GG, ECF No. 52-1, 2. Specifically, he found that plaintiffs "consistently received longer suspensions for identical violations when compared to similarly situated white employees." Id. at 6. He further noted that white employees were often permitted four Step 3 violations of the Absenteeism Policy before being terminated, while some plaintiffs were dismissed after their first such violation.

## III.  DISCUSSION

CSX argues that it is entitled to summary judgment on all claims asserted by each plaintiff because: (1) the claims are time-barred; (2) there is no evidence of a racially hostile work environment; and (3) plaintiffs cannot establish that they were discriminated against on account of their race. Defendant also maintains that plaintiff Burkett's claims are preempted by the Railway Labor Act because they require interpretation of the collective bargaining agreement. Finally, CSX seeks to preclude the testimony of plaintiffs' expert, Jamie C. Modesitt.

### A.  Motion for Summary Judgment—Legal Standard

CSX has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. **Statute of Limitations**

CSX argues that the majority of plaintiffs' claims arise from incidents that occurred outside the applicable statute of limitations periods. Plaintiffs tacitly acknowledge that any discrete acts of discrimination that fall outside the statutory period cannot form the basis of

individual disparate treatment claims.  However, they maintain that their hostile work environment claims may be based on such incidents.

### 1. **Disparate Treatment**

The statute of limitations for § 1981 race discrimination claims is four years, and three years for NYHRL claims.  <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 382–83 (2004) (§ 1981); <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996) (NYHRL).  Discrete acts of discrimination occurring outside the statutory period are therefore not actionable under § 1981 or NYHRL.  <u>Washington v. Cnty. of Rockland</u>, 373 F.3d 310, 317–18 (2d Cir. 2004) (§ 1981); <u>Bonner v. Guccione</u>, 178 F.3d 581, 584 (2d Cir. 1999) (NYHRL).  Examples of discrete discriminatory acts include "termination, failure to promote, denial of transfer, or refusal to hire."  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002).  A plaintiff's discrimination claim accrues when he knew or should have known about the discriminatory action.  <u>Washington</u>, 373 F.3d at 319.  An individual disciplinary charge is a discrete act, and a discrimination claim based upon such a charge accrues when the charge is filed.  <u>Id</u>. at 318.

Kemp filed this action on June 23, 2011.  Therefore, his § 1981 disparate treatment claims can only arise from discrete acts of discrimination that occurred after June 23, 2007— specifically, the June 29, 2007, and May 2008 absenteeism charges, which led to a five-day suspension and his termination, respectively.[9]  Likewise, his NYHRL claims can only involve discriminatory acts that occurred after June 23, 2008.  As all of the alleged discrete acts of

---

[9] Thus, his claims cannot arise from the four "operational test failure notations" lodged against him in 2005; defendant's failure to allow him to qualify for the Buffalo Line prior to the fall of 2006; Division Foreman Novenche's allegation that he cheated on the written exam in 2006 and the requirement that he re-take the exam; and the three counseling letters he received for absenteeism infractions dated May 15, 2005, October 27, 2005, and October 23, 2006.

discrimination occurred before that date, Kemp's NYHRL claims of disparate treatment are untimely.

The other four plaintiffs joined the litigation on December 14, 2011. Thus, their § 1981 disparate treatment claims can only arise from discrete acts of discrimination that occurred after December 14, 2007. Similarly, their NYHRL claims can only involve discriminatory acts that occurred after December 14, 2008.

Therefore, Smith's § 1981 claims of disparate treatment can only arise from the absenteeism infraction lodged against him in April 2008, which resulted in a one-month suspension; defendant's refusal to grant him additional FMLA leave in August 2008; and the circumstances surrounding his resignation in September 2008.[10] As all of the alleged discrete acts of discrimination occurred before December 14, 2008, Smith's NYHRL claims of disparate treatment are untimely.

McKay's § 1981 claims of disparate treatment can only be based on his suspensions for missed calls on July 26, 2008, August 31, 2008, and August 26, 2009; his first termination for a missed call on April 18, 2010; the discipline he received from Foreman Novenche after complaining about Steve Bennie's racial slurs in December 2011; and his second termination on May 24, 2012.[11] His NYHRL claims can involve the same incidents—except for the July 26 and August 31, 2008, suspensions, which are outside the NYHRL statutory period.

Burkett's § 1981 disparate treatment claims can only arise from the punishment he

---

[10] The untimely incidents include defendant's delay in allowing Smith to qualify for the Buffalo Line and the requirement that he re-take the written exam in 2006, the counseling letters he received in 2006, and the additional charges of absenteeism lodged against him in January and September of 2007.

[11] The untimely incidents include his delayed qualification for the Buffalo Line in 1999; his termination or suspension in April 2005; and the counseling letters he received on June 10 and September 14, 2007.

received as a result of the August 1, 2008, incident during which Ron Weremeichik threw a radio at his head; his March 31, 2009, termination; and the circumstances surrounding defendant's offer of reinstatement in June 2009. His NYHRL claims can only be based on the latter two incidents, as the August 2008 incident occurred outside the NYHRL statutory period.

The only incident supporting Thompson's § 1981 and NYHRL disparate treatment claims is his April 1, 2010, termination that stemmed from the March 11, 2010, infraction and positive drug test. He alleges that defendant's refusal to offer him a leniency reinstatement thereafter was based on racial animus. This incident is well within the statutory period for his § 1981 and NYHRL claims.

In sum, all five plaintiffs' § 1981 disparate treatment claim (First Cause of Action) is timely, but is limited to incidents occurring after June 23, 2007, for Kemp and after December 14, 2007, for the other four plaintiffs. The NYHRL disparate treatment claim (Fourth Cause of Action) is untimely as it relates to the allegations of plaintiffs Kemp and Smith, but is timely as it relates to plaintiffs McKay, Burkett, and Thompson and the incidents that occurred after December 14, 2008. Conversely, the alleged incidents related to plaintiffs' qualification to work on the Buffalo Line all occurred outside the applicable statutory periods, and the § 1981 and NYHRL claims regarding this issue (Second and Fifth Causes of Action) will therefore be dismissed.

### 2. Hostile Work Environment

Unlike disparate treatment claims, "[a] claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes

of determining liability.'" Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004) (quoting Morgan, 536 U.S. at 117). The discriminatory act that occurred within the statutory period must be related to the alleged ongoing policy or conduct contributing to the hostile work environment. See id.

Plaintiffs have identified incidents related to their hostile work environment claims that took place within the requisite period. In addition to the aforementioned timely incidents of discrete acts of alleged discrimination, plaintiffs claim to have been subjected to racial slurs and racist graffiti at work throughout their employment, including within the past few years. For example, Kemp alleges that on November 3, 2011, a co-worker referred to Trainmaster McCant as a "coconut," one of the many slurs that plaintiffs maintain had been directed at McCant for years. McKay reports that upon his return to work in 2011, Steve Bennie continued to direct racial slurs at him as he had done in the past and physically assaulted him. When McKay reported these incidents to Foreman Novenche, minimal action was taken against Bennie and McKay was instead disciplined for minor infractions and allegedly bogus charges.

Burkett claims that in August 2008 he was physically assaulted by a co-worker who had regularly directed racial slurs at him in the past. When administrators investigated this incident, they focused on Burkett's relatively minor infractions and meted out the same punishment to the offending co-worker, who was not required to serve his full suspension. Further, after he was terminated, CSX offered Burkett reinstatement only if he agreed to waive any claims of racial discrimination.

Moreover, plaintiffs have provided declarations from several former CSX employees who often overheard racial slurs directed at plaintiffs and observed racist graffiti in the Selkirk

facility throughout their employment.  Two African–American former employees report that Assistant Terminal Superintendent Gene Payne, Jr., became hostile towards them at the Selkirk facility in September 2009, referred to them as "boys" in a racially condescending manner, and lodged frivolous disciplinary charges against them.  Mavin Decl., ECF No. 61-30, ¶ 13; Muttari Decl., ECF No. 61-31, ¶¶ 17–18.  Payne is the same supervisor who allegedly sent emails praising Seth Fowler for presiding over the 2008 hearing that led to Kemp's termination and stating that Kemp "didn't belong."

In short, plaintiffs have identified timely incidents of alleged discrimination that are closely related to the untimely incidents and involve similar allegations that racial slurs were often used in their presence, racist graffiti and innuendo was frequently displayed in the workplace, and they were more severely punished than non-minority co-workers.  Therefore, plaintiffs' hostile work environment claims are timely, and the incidents that occurred outside the statutory period are relevant to the alleged ongoing hostile work environment.

Accordingly, all five plaintiffs' § 1981 and NYHRL hostile work environment claims (Third and Sixth Causes of Action) are timely.

### C.  Merits of the Hostile Work Environment Claims

CSX argues that it is entitled to summary judgment on plaintiffs' hostile work environment claims because:  (1) the allegations supporting these claims are conclusory and insufficient to create an issue of material fact for trial; (2) the alleged harassment was neither severe nor pervasive, and was instead merely sporadic and isolated; and (3) the discriminatory conduct cannot be imputed to CSX.

To succeed on their hostile work environment claims, plaintiffs must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir. 2012) (internal quotation marks omitted).[12]  The requirement that harassment be severe or pervasive "does not mean that employers are free from liability in all but the most egregious of cases." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (internal quotation marks omitted).  A court must consider the totality of the circumstances when applying this standard. Rivera, 702 F.3d at 693.  Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Id. (internal quotation marks and alteration omitted).

Plaintiffs must also show "a specific basis for imputing the conduct creating the hostile work environment to the employer." Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted).  To establish this, plaintiffs must show that CSX "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." Id. (internal quotation marks omitted).

Plaintiffs allege that they were subjected to vulgar racial language throughout their employment and often viewed racial slurs and Confederate flags displayed prominently on walls of regional offices.  They also point to several specific employees who used racial slurs in their presence on specific occasions.  Some of these allegations involve the repeated and

---

    [12]  The standard to be applied to plaintiffs' § 1981 and NYHRL hostile work environment claims is the same.  Id. at 694 n.4.

abusive use of vulgar slurs in the presence of supervisors who did nothing to stem the use of such language. These allegations are supported by plaintiffs' deposition testimony as well as declarations from non-party witnesses.

It is undisputed that CSX had harassment policies in place and an Ethics Hotline through which plaintiffs could have lodged complaints of racial discrimination. However, there is evidence in the record suggesting management failed to take appropriate remedial action after learning of incidents of harassment and instead punished minority employees who complained of discrimination. Indeed, former employee Timothy Muttari claims that he overheard Assistant Terminal Superintendent Gene Payne, Jr., tell a co-worker that he planned to charge an African–American employee with a minor infraction and have him terminated because that employee complained of Payne's racist remarks. Muttari Decl., ECF No. 61-31, ¶ 18.

Plaintiffs further allege that they were suspended and/or terminated while non-minority workers were not punished as severely for similar infractions. Finally, McKay and Burkett have detailed incidents of physical violence in the workplace, which they suggest was influenced by racial animus (or at least the response to such incidents was allegedly influenced by discrimination).

Viewing the totality of the circumstances in the light most favorable to plaintiffs, there is sufficient admissible evidence in the record to establish issues of material fact as to whether they were subjected to a hostile work environment of which CSX management was aware but failed to mitigate. See Rivera, 702 F.3d at 694–95. Accordingly, defendant's motion for summary judgment on plaintiffs' hostile work environment claims will be denied.

**D.  Merits of Disparate Treatment Claims**

CSX argues that any adverse employment actions taken against plaintiffs were due to acknowledged infractions, not racial discrimination, and were taken pursuant to the applicable collective bargaining agreement and IDPAP.

Claims of employment discrimination brought pursuant to § 1981 and NYHRL are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).  Under this standard, plaintiffs must first establish a prima facie case of discrimination by showing that they:  (1) belonged to a protected class; (2) were qualified for their employment positions; and (3) suffered adverse employment actions that (4) occurred under circumstances giving rise to an inference of discriminatory intent.  Id.; Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012).  An adverse employment action is one that causes the employee to endure "a materially adverse change in the terms and conditions of employment."  Brown, 673 F.3d at 150 (internal quotation marks omitted).  It is an action that "is more disruptive than a mere inconvenience or an alteration of job responsibilities."  Id. (internal quotation marks omitted).

If plaintiffs meet this initial burden, then CSX must offer, through admissible evidence, a legitimate non-discriminatory reason for the adverse employment action.  Vivenzio, 611 F.3d at 106.  Finally, if defendant articulates such a reason, plaintiffs must produce evidence and carry the burden of persuasion to show that the proffered reason is merely pretext for discrimination.  Id.

It is undisputed that plaintiffs belonged to a protected class, were qualified for their employment positions during the relevant time, and were suspended and/or terminated.

Further, viewed in the light most favorable to plaintiffs, the same circumstances and factual allegations supporting their hostile work environment claims also support an inference of discrimination.  See Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001).  Therefore, plaintiffs have established a prima facie case of disparate treatment for purposes of the summary judgment motions.

CSX argues that there were legitimate non-discriminatory reasons for the adverse employment actions.  Plaintiffs tacitly concede that there were legitimate reasons for most of their terminations and suspensions.  They maintain, however, that CSX's disciplinary scheme allowed divisional supervisors to exercise discretion when charging and punishing employees for infractions.  They further claim that supervisors in the Albany Division punished them more severely than non-minority employees who committed similar employment infractions, suggesting the legitimate reasons were a pretext for discrimination.

### 1. **Plaintiff Kemp**

As noted above, Kemp's § 1981 claim of disparate treatment only involves the June 29, 2007, and May 2008 absenteeism charges, which led to a five-day suspension and his termination, respectively.  There is sufficient evidence in the record that, when viewed in the light most favorable to Kemp, could lead a rational juror to conclude that these actions were taken with discriminatory intent.

For example, after the administrative hearing that resulted in Kemp's termination, Assistant Terminal Superintendent Gene Payne, Jr., emailed the hearing officer and wrote: "Great job on this one."  Hoke Decl., Ex. W, ECF No. 61-23.  Payne then emailed Assistant Division Manager Jerald Lewandowski and, referring to Kemp, noted that "He didn't belong." Id.  Moreover, Kemp has identified several white co-workers with allegedly comparable

absenteeism records who either were not terminated or were granted a leniency reinstatement.  See Pl.'s Counter-Statement of Material Facts, ECF No. 61-34, ¶ 24.  This presents an issue of fact as to whether CSX treated similarly situated white employees more leniently than Kemp and whether his termination for absenteeism violations was merely a pretext for discrimination.  See Graham v. Long Island R.R., 230 F.3d 34, 39–40 (2d Cir. 2000).

Accordingly, defendant's motion for summary judgment on Kemp's § 1981 disparate treatment claim will be denied.

### 2.  Plaintiff Smith

Smith's § 1981 claim of disparate treatment involves the absenteeism infractions lodged against him in April and August 2008, which resulted in a one-month suspension, and the circumstances surrounding his resignation in September 2008, which he argues constitute constructive discharge.  He specifically argues that the absenteeism charges stemmed from defendant's refusal to grant him light duty assignments or additional FMLA leave,[13] as was afforded to similarly situated white employees.  He claims that he resigned due to the ongoing racial discrimination and representations made to him regarding CSX's intention to fire him regardless of what evidence was presented at the pending disciplinary hearing.

Viewing the evidence in the light most favorable to Smith, there are issues of material fact regarding whether his suspension was the result of discriminatory intent and whether the absenteeism violations were merely pretext for discrimination.  He has identified at least one

---

[13]  Smith does not argue that the refusal to grant him additional FMLA leave, by itself, is an adverse employment action.

allegedly similarly situated Caucasian conductor who was granted light duty[14] and excess FMLA leave while temporarily disabled.  See Def.'s Statement of Material Facts, ECF No. 45-53, ¶ 46; Smith Decl., ECF No. 65-31, ¶ 23.  Defendant's refusal to afford the same leniency to Smith supports his assertion that such adverse employment actions were taken with discriminatory animus.

Similarly, there is sufficient evidence in the record to establish an issue of material fact as to whether the circumstances leading up to Smith's resignation amount to constructive discharge.  As noted above, there is ample evidence to permit a rational juror to conclude that plaintiffs were subjected to a hostile work environment rife with racial slurs, graffiti, and threatening conduct.  In this racially charged environment, Smith's requests for medical leave or a light duty assignment were summarily denied and he was instead repeatedly charged with violations of the Absenteeism Policy.  A reasonable juror could infer that this was done intentionally for the purpose of forcing Smith out of his employment.  Indeed, he has identified several white co-workers with allegedly comparable absenteeism records who were not threatened with termination.  See Pl.'s Counter-Statement of Material Facts, ECF No. 65-33, ¶ 17.  Further, he maintains that he resigned only after his union representative informed him that CSX management intended to terminate his employment at the upcoming disciplinary hearing.[15]

Viewing the totality of this evidence in the light most favorable to Smith, there is an

---

[14]  The parties dispute whether Smith requested a light duty assignment through the proper channels. This presents another issue of material fact.

[15]  Defendant's assertion that the union representative's statement is inadmissible hearsay is unpersuasive.  This statement is not offered to prove that CSX actually intended to fire Smith.  It is instead offered to explain why he resigned in September 2008 and to counter defendant's argument that his resignation was strictly voluntarily.  See FED. R. EVID. 801(c).

issue of material fact as to whether he was constructively discharged and whether such was done with discriminatory intent.  See Terry v. Ashcroft, 336 F.3d 128, 152–53 (2d Cir. 2003); Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89–90 (2d Cir. 1996).

Accordingly, defendant's motion for summary judgment on Smith's § 1981 disparate treatment claim will be denied.

### 3. **Plaintiff McKay**

McKay's claims of disparate treatment involve his suspensions for missed calls on July 26, 2008, August 31, 2008, and August 26, 2009; his first termination for a missed call on April 18, 2010; and his second termination on May 24, 2012.  CSX argues that these adverse employment actions were taken for legitimate reasons; to wit, McKay's violations of the Absenteeism Policy.  McKay acknowledges that he violated the policy, but claims that non-African–American employees were afforded more lenient punishment.

There is sufficient evidence in the record that, when viewed in the light most favorable to McKay, presents an issue of material fact as to whether these adverse actions were motivated by racial animus.  Indeed, he has identified several white co-workers with allegedly comparable absenteeism records whose employment was not terminated.  See Pl.'s Counter-Statement of Material Facts, ECF No. 64-34, ¶ 17.

Also, McKay's first termination stemmed from the fact that he was locked out of his car and his supervisor refused to allow him to borrow the necessary tools for his shift.  He identifies a Caucasian employee who was absent from work due to car trouble, but his absence was reportedly excused by Assistant Division Manager John Gaylord.  Id. ¶ 19.  As a result of this infraction, a hearing was conducted and McKay's employment was terminated on June 3, 2010.  The hearing officer who presided over that proceeding was Seth Fowler—

the same hearing officer who was praised by Assistant Terminal Superintendent Gene Payne, Jr. for terminating plaintiff Kemp's employment two years before.

Moreover, McKay's final termination resulted from two alleged violations of IDPAP. He asserts that these charges were bogus and were lodged against him in retaliation for his complaint of racial harassment and assault by co-worker Steve Bennie. McKay filed that complaint on February 27, 2012, and an investigation was initiated. He was charged with the first rule violation on March 26. On April 2, Field Manager Brian Stussie emailed Assistant Division Manager Gaylord and, in reference to McKay's March 26 violation, advised "we need everyone to keep a good eye on this." Hoke Decl., Ex. Z, ECF No. 64-26. On that same day, the second IDPAP violation was lodged against McKay. Viewed in the light most favorable to McKay, this email and the close temporal nexus of his complaint and the disciplinary charges are sufficient to present an issue of material fact as to whether his final termination was motivated by racial animus.

Accordingly, defendant's motion for summary judgment on McKay's disparate treatment claims will be denied.

### 4. Plaintiff Burkett

Burkett argues that his March 31, 2009, termination and the circumstances surrounding defendant's offer of reinstatement in June 2009 constituted disparate treatment. Defendant maintains that Burkett's termination was based solely on the terms of the collective bargaining agreement and his attendance records, not his race. Burkett does not dispute that the collective bargaining agreement provides for the immediate termination of an employee who is absent for over thirty days. Nor does he seriously dispute that he was, in fact, absent for over thirty days. His allegations of disparate treatment instead center on

CSX's offer to reinstate his employment only if he waived all claims of discrimination against the company.[16]

Burkett reports that numerous white conductors were granted leniency reinstatements without such a caveat. See Pl.'s Counter-Statement of Material Facts, ECF No. 62-22, ¶¶ 17, 19. Defendant correctly points out that these employees had not been dismissed for violating the collective bargaining agreement's self-executing thirty-day absence rule. They were instead terminated for physically violent conduct, the use of profanity, and threats of violence. Pl.'s Mem. Opp'n Summ. J., ECF No. 62-23, 23.

However, defendant's offer of reinstatement was reportedly dependent on Burkett waiving any claims of racial discrimination. Viewed in the light most favorable to Burkett, this caveat—coupled with the alleged ongoing hostile work environment and the allegedly unequal discipline stemming from the August 2008 incident involving Ron Weremeichik— could lead a rational juror to conclude that his termination was merely a pretext for discrimination and defendant's refusal to offer an unqualified leniency reinstatement was colored by racial discrimination.

Accordingly, defendant's motion for summary judgment on Burkett's disparate treatment claims will be denied.

_____

[16] Burkett also challenges the validity of defendant's determination that he technically violated this provision of the collective bargaining agreement. However, CSX is correct that such an argument is improper here. Any controversies regarding the interpretation or application of the collective bargaining agreement must be resolved pursuant to the Railway Labor Act. See 45 U.S.C. § 153(i) (disputes between employer and employee arising out of the interpretation or application of collective bargaining agreement may be referred to National Railroad Adjustment Board); Parker v. Metro. Transp. Auth., 97 F. Supp. 2d 437, 445 (S.D.N.Y. 2000) (the Railway Labor Act requires arbitration of such disputes). Burkett's disparate treatment claims instead focus on whether defendant's seemingly legitimate reason for terminating his employment pursuant to the collective bargaining agreement was merely a pretext for discrimination, as allegedly evidenced by the circumstances surrounding the offer of reinstatement.

### 5. **Plaintiff Thompson**

The only incident supporting Thompson's disparate treatment claims is his termination on April 1, 2010.  Defendant asserts that he was terminated due to the March 11, 2010, major IDPAP violation and subsequent positive drug test.  Thompson concedes that his dismissal was justified, but alleges that defendant's refusal to offer him a leniency reinstatement thereafter was based on racial animus.

In support of his claim, Thompson identifies one engineer who was permitted a leniency reinstatement after being terminated following a major IDPAP violation and subsequently testing positive for cocaine.  See Pl.'s Counter-Statement of Material Facts, ECF No. 66-32, ¶¶ 17–19.  The parties dispute whether the circumstances surrounding that event are sufficiently comparable to Thompson's situation to permit a finding of pretext.  This presents an issue of material fact to be determined by a jury.

Accordingly, defendant's motion for summary judgment on Thompson's disparate treatment claims will be denied.

### E. **Motion to Preclude Plaintiffs' Expert**

Finally, CSX asserts that plaintiffs' expert, Jamie Modesitt, must be precluded from testifying at trial because his methodology is unreliable.  Specifically, defendant claims Modesitt misunderstood and misapplied the IDPAP and Absenteeism Policy, and relied on representations and records provided to him by plaintiffs' counsel instead of conducting an independent review of the record.  CSX also argues that Modesitt's opinion is biased by virtue of his position as a senior union representative for CSX conductors.  Finally, defendant claims Modesitt's testimony is not needed or helpful to the jury because he merely counts the number of disciplinary charges on an employee's record and concludes that CSX has

disproportionately applied its policies against plaintiffs.

Plaintiffs argue that Modesitt's experience as a union representative provides him with specialized knowledge of CSX's policies and pattern of imposing disciplinary measures on its employees. They further assert that any bias or flaws in his application of CSX's policies speak to the weight to be afforded to his testimony, not its admissibility.

Federal Rule of Evidence 702 affords expert witnesses "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592 (1993). It is well-established that "[u]nder <u>Daubert</u>, the district court functions as the gatekeeper for expert testimony whether proffered at trial or in connection with a motion for summary judgment." <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citation omitted). Such testimony must be relevant and reliable, and is properly excluded if it is "speculative or conjectural." <u>Id</u>. (internal quotation marks omitted).

Before deeming an expert's testimony sufficiently reliable, a court must ensure: "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted) (citing FED. R. EVID. 702). This inquiry is "flexible," and a district court "enjoy[s] considerable discretion in deciding on the admissibility of expert testimony." <u>United States v. Farhane</u>, 634 F.3d 127, 158 (2d Cir.) (internal quotation marks and citation omitted), <u>cert. denied</u>, <u>Sabir v. United States</u>, 132 S. Ct. 833 (2011).

Plaintiffs correctly point out that defendant's arguments speak to the weight to be

afforded to Modesitt's testimony, not its admissibility. Defense counsel can subject Modesitt's methods and conclusions to rigorous cross-examination, attempt to highlight any alleged bias, question the propriety of his application of the IDPAP and Absenteeism Policy, and make appropriate objections to his testimony at trial.

Accordingly, defendant's motion to preclude the testimony of Jamie Modesitt will be denied.

## IV. **CONCLUSION**

There are issues of material fact as to whether plaintiffs were subjected to a hostile work environment which CSX management knew about but failed to remedy. There is also sufficient evidence in the record to sustain the § 1981 and NYHRL disparate treatment claims related to plaintiffs' suspensions and terminations that occurred within the applicable statutory periods. Although plaintiffs acknowledge that the majority of the adverse employment actions taken against them were justified by their infractions, they maintain that similarly situated non-minority employees were permitted greater leniency. They have identified sufficient evidence in the record to raise issues of material fact as to whether the proffered legitimate reasons for the adverse employment actions were merely pretext for racial discrimination. Finally, the testimony of plaintiffs' expert, Jamie Modesitt, are sufficiently relevant and reliable to be presented to the jury.

Therefore, it is

ORDERED that

1. Defendant CSX Transportation, Inc.'s motions for summary judgment are GRANTED in part and DENIED in part;

2. Plaintiffs' First Cause of Action alleging disparate treatment pursuant to 42 U.S.C.

§ 1981 remains for trial, but is limited to adverse employment actions taken against plaintiff Kemp after June 23, 2007, and against plaintiffs Smith, McKay, Burkett, and Thompson after December 14, 2007;

    3.  Plaintiffs' Second Cause of Action alleging disparate treatment pursuant to 42 U.S.C. § 1981 related to their qualification for the Buffalo Line is DISMISSED;

    4.  Plaintiffs' Third Cause of Action alleging hostile work environment pursuant to 42 U.S.C. § 1981 remains for trial;

    5.  Plaintiffs' Fourth Cause of Action alleging disparate treatment pursuant to New York Human Rights Law remains for trial, but is limited to adverse employment actions taken against plaintiffs McKay, Burkett, and Thompson after December 14, 2008;

    6.  Plaintiffs' Fifth Cause of Action alleging disparate treatment pursuant to New York Human Rights Law related to their qualification for the Buffalo Line is DISMISSED;

    7.  Plaintiffs' Sixth Cause of Action alleging hostile work environment pursuant to New York Human Rights Law remains for trial; and

    8.  Defendant's motion to preclude the testimony of plaintiffs' expert, Jamie C. Modesitt, is DENIED.

    IT IS SO ORDERED.

_____
United States District Judge

Dated:  January 27, 2014
       Utica, New York.

The trial will commence with jury selection at 9:30 a.m. on July 14, 2014, in Utica, New York. Pretrial submissions shall be filed on or before June 27, 2014, at noon.